# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

_____

In Re:

**Deer Valley Trucking, Inc.,**

            **Debtor.**

**Bankruptcy Case
No. 15-40284-JDP**

_____

## MEMORANDUM OF DECISION
_____

**Appearances:**

Thomas Smith, SERVICE & SPINNER, Pocatello, Idaho, Attorney for Chapter 7 Trustee.

Jason Naess, PARSONS, SMITH, STONE, LOVELAND & SHIRLEY, LLP, Burley, Idaho, Attorney for Duncan Limited Partnership.

### *Introduction*

Chapter 7 trustee[1] R. Sam Hopkins ("Trustee") objects to the proof of

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, all Rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037, and all Civil Rule references are to the Federal Rules of Civil Procedure, Rules 1–86.

MEMORANDUM OF DECISION – 1

claim filed in this chapter 7 case by Duncan Limited Partnership ("DLP").

Dkt. No. 392.  DLP contests Trustee's objection.  Dkt. No. 409.  The Court

conducted a hearing concerning the objection on December 13, 2016, at

which the parties presented evidence and testimony.  *See* Minute Entry,

Dkt. No. 438.  Closing arguments were submitted via briefs.  Dkt. Nos. 456,

457, 462, 463.  Having taken the issues under advisement, and having

considered the evidence and testimony, arguments of the parties, and

applicable law, this Memorandum sets forth the Court's findings,

conclusions and reasons for its disposition of the objection.  Rules 7052;

9014.

### *Facts*

Deer Valley Trucking, Inc. ("DVT") was founded by Jason Duncan

in late 2009.  On April 3, 2015, DVT filed a chapter 11 petition.  Dkt. No. 1.

On February 12, 2016, the case was converted to a chapter 7 case.  Dkt. No.

181.  Amended Proof of Claim No. 50 was filed on October 31, 2016, by

MEMORANDUM OF DECISION – 2

DLP, an entity owned by Jason's[2] parents, Jack and Janet Duncan ("the Duncans"). Am. Proof of Claim at 1, Ex. 213. The claim asserts that DVT owes DLP approximately $2.4 million, arising from three separate credit transactions. *Id.* at 3.

### A.     The Winch Truck Loan and Equipment Loan

Jason testified that, when it began operations, DVT purchased a specialized truck. JD Farms, LLC, an entity owned by the Duncans, loaned DVT the funds to do so. The parties refer to this transaction as the Winch Truck Loan. Exs. 201.

Jason testified that prior to, and shortly after, the formation of DVT, JD Farms loaned funds to DVT, and to other entities in which Jason held an interest, to purchase other trucks and equipment. Jason testified that once DVT was formed, those trucks and the equipment were transferred to DVT. That DVT also assumed these debts is not disputed by Trustee. The parties refer to these obligations collectively as the Equipment Loan.

---

[2] Solely for clarity, the Court refers to the Duncan family members by their first names. No disrespect is intended.

MEMORANDUM OF DECISION – 3

Both the Winch Truck Loan and the Equipment Loan balances were

to be repaid over a three-year period in monthly installments, together

with eight percent interest.  Exs. 201, 202.  While DVT made numerous

payments on the loans to JD Farms, in about June 2012, it began to make

payments on the loans to DLP.  According to Janet, JD Farms assigned the

loans to DLP based upon the advice of an estate planning attorney

representing the Duncans.  That DVT is now obliged to pay DLP on these

loans, rather than JD Farms, is not disputed by Trustee.  DVT continued

making the required payments to DLP through November 2012; it made

no payments on these loans thereafter.  Exs. 201 at 2; 202 at 2.

**B.      The Factoring Loan**

Jason testified that in July 2010, DVT had an opportunity to expand

its business.  To fund that growth, he approached a number of individuals

to see if they would be interested in either loaning money to, or making

capital investments in, DVT.  Jason testified that it was during this time

that he approached his father about his efforts to raise money for DVT.

Janet testified that, when he asked, the Duncans told Jason they were not

MEMORANDUM OF DECISION – 4

interested in investing in DVT.

Jason testified that after the Duncans declined to invest in DVT, he requested that they make a "factoring" loan to DVT (the "Factoring Loan"). Jason testified the this loan was intended to enable DVT to hire more employees.  Paul Duncan[3] explained that he understood that because DVT needed to pay its drivers a month or two before DVT received payment from its customers, DVT needed financing to operate during the gap.  The Factoring Loan was intended to provide that financing.

The Duncans agreed to make the Factoring Loan to DVT.  Notably, the loan was to accrue interest at 25%.  Janet testified that the interest rate on the Factoring Loan was "very attractive" to the Duncans.  Paul testified that he understood that another lender was already providing factoring to DVT at a higher interest rate, so both the Duncans and DVT stood to benefit from the Factoring Loan.  Jason further testified that DVT's need for financing was significant at that time, and that he was utilizing the loan

---

[3] Paul is Jason's brother. He testified that he is a general partner of DLP, and that he helps his mother with the affairs of that entity.

MEMORANDUM OF DECISION – 5

from the Duncans, funds contributed by his partner, and funds from a factoring company to operate the company's business.

As with the Winch Truck and Equipment Loans, DVT originally made payments on the Factoring Loan to JD Farms, and then in about June 2012, began making payments to DLP. *See* Ex. 103-5. Jason testified that the original balance of the Factoring Loan was $1.7 million. *See* Ex. 203. Jason testified that while under the agreement, DVT was obliged to make monthly interest payments on the Factoring Loan, but he and his father did not agree on a date when the principal balance was to be paid off. DVT made multiple interest payments on the Factoring Loan, but stopped making payments in November 2012. *See also* Exs. 103-5, 103-6.

**C.    The Promissory Notes and Subordination Agreement**

Jason testified that the original agreements for all of the DLP loans were oral. However, in September 2012, the terms of the loans were renegotiated and formalized through the drafting and execution by DVT of promissory notes. Exs. 214, 215, 216. Jason testified that, at about this time, DVT was attempting to obtain additional financing from GE Capital

MEMORANDUM OF DECISION – 6

Corporation, and that the lender would not provide any funds to DVT

unless DLP agreed to subordinate its interests to that of GE Capital.  Jason

testified that to facilitate a subordination agreement between DLP and GE

Capital, DVT's corporate counsel drafted the promissory notes, and DVT's

president, Wade Chapman, signed them.  *See* Exs. 214, 215, 216.

The effective date of the promissory notes for the Winch Truck and

Equipment Loans was December 1, 2012.  Exs. 214 at 1, 215 at 1.  The notes

all provided that the remaining balances of the loans were to be repaid in

twelve monthly installments at 15% interest.  Exs. 214 at 1; 215 at 1.  The

effective date of the promissory note for the Factoring Loan was January 1,

2013.  Ex. 216.  It was to be repaid in 120 monthly installments with

interest accruing at 15%.

In August, 2013, DLP, GE Capital, and DVT entered into a

subordination agreement.  Ex. 207.[4]  Under its terms and the promissory

---

[4] The copy of the subordination agreement admitted in evidence is not
signed by all the parties, but Paul testified that he believed that, at some point, all
necessary parties signed the agreement, because DVT eventually received the
financing from GE Capital.  The subordination agreement recites that its purpose
was to subordinate any interests DLP may have had in any collateral [*i.e.* DVT

MEMORANDUM OF DECISION – 7

notes, DVT was precluded from making any payments to DLP, and DLP

was precluded from accepting payments from DVT, unless certain

"Payment Conditions" were met.  Ex. 207 at 1; *see also* Ex. 214 at 2.  For

example, the conditions specified that DLP could not be paid if DVT was

in default on the GE Capital loan;  DVT also had to meet a certain "fixed

charge coverage ratio"[5] to make payments to DLP.  Ex. 207 at ¶ 1(I); *see also*

Ex. 214 at 2.  The record does not reflect whether these conditions were

ever met by DVT, but no further payments were made by DVT to DLP on

the Equipment and Winch Truck Loans.

### D.    Balances Due on the Loans

The balances due on the loans, asserted in the DLP Amended Proof

of Claim, and in DLP's closing brief, do not coincide.  In its proof of claim,

DLP asserts that the balances due on the Winch Truck Loan, the

---

accounts receivables] to the secured rights of GE Capital, and in addition, to
subordinate DLP's right to payment to GE Capital.

[5] The promissory notes contain these same requirements.  Exs. 214 at 2;
215 at 2; 216 at 2. Section 6 of the promissory notes defines the calculation of the
"fixed charge coverage ratio."  *See, e.g.* Ex. 214 at 2.

MEMORANDUM OF DECISION – 8

Equipment Loan, and the Factoring Loan, were $63,060.51, $147,787.63, and $2,261,000.00, respectively. Ex. 213 at 3. Of those totals, $52,983.03, $124,169.35, and $1,700,000.00, are asserted as principal balances, with the remainder being claimed as accrued prepetition interest. *Id.*

In contrast, in its closing brief, DLP asserts the total balances due on the Winch Truck Loan, the Equipment Loan, and the Factoring Loan, as of two days prior to the filing of the petition, were $67,906.61, $158,761.62, and $2,273,175.94, respectively. DLP's Br. at 12, Dkt. No. 457. These amounts were apparently calculated based on the terms of the promissory notes. DLP's Br. at 11; *compare* DLP's Br. at 14–16 *with* Exs. 214 at 1, 215 at 1, 216 at 1. To compute these amounts, DLP utilized the principal balances of the loans as of the effective dates of the promissory notes, which were $47,956.48, $112,120.37, and $1,700,000.00. DLP's Br. at 14–16. It then calculated the monthly balances of the loans as interest accrued monthly until the filing of the petition. *Id.* The Factoring Loan balance also accounts for three payments that were apparently made by DVT to DLP in January and April 2013. *Id.* at 11, 16

MEMORANDUM OF DECISION – 9

### E.     The Bankruptcy Case

On April 3, 2015, DVT filed a chapter 11 bankruptcy petition.  Dkt.

No. 1.  In its Schedule F, it listed a claim in favor of DLP for $2,500,000, as

having been incurred in "11/2012", for "Operating Loan."  Dkt. No. 21 at

41.  In its Statement of Financial Affairs, Wade Chapman and Jason

Duncan were each listed as owning 50% of the stock in DVT.  *Id.* at 71.

Jason verified the Schedules and Statement of Financial Affairs under

penalty of perjury on behalf of DVT.  *Id.* at 64, 73.  When DVT was unable

to reorganize, on February 12, 2016, the case was converted to a chapter 7

case.  Dkt. No. 181.  Trustee was appointed to serve as chapter 7 trustee.

Dkt. No. 191.

### *Analysis*

### A.     Allowance of Claims

A proof of claim, filed under § 501, and in accordance with Rule

3001, is deemed allowed, and constitutes prima facie evidence of the

validity and amount of the claim.  § 502(a); Rule 3001(f).  However, if a

party in interest objects to a claim, the Court must determine whether the

MEMORANDUM OF DECISION – 10

claim is allowed, and if so, the amount of the claim as of the date of the filing of the petition.  *See* § 502(b); *In re Davis*, 554 B.R. 918, 921 (Bankr. D. Idaho 2016).

### B.   Trustee's Grounds for Objection

DLP attached only unsigned copies of the promissory notes to the proof of claim filed in this bankruptcy case.  Understandably, then, most of Trustee's grounds for objecting to DLP's Amended Proof of Claim targeted the validity and enforceability of its undocumented claims against DVT. *See* Am. Obj. to Claim at 2, Ex. 392.  However, after the hearing, before the first round of closing briefs were filed, the parties stipulated to the admission into evidence of signed copies of the three promissory notes. Dkt. No. 449; Exs. 214, 215, 216.[6]  As a result, in his closing brief, Trustee limited his objection to DLP's claim to three grounds.  Tr.'s Br. at 10, Dkt. No. 456.

First, Trustee argues that the entire amount of the Factoring Loan

---

[6]  While the evidentiary record was closed at the conclusion of the hearing, discerning no prejudice, and given the stipulation of the parties, the Court will consider the notes as part of the evidentiary record.

MEMORANDUM OF DECISION – 11

should be recharacterized from a debt to an equity interest.  Tr.'s Br. at 5,

10.  Second, Trustee argues that should the Factoring Loan portion of the

claim not be recharacterized, it should be subordinated to other claims in

the bankruptcy case pursuant to § 510(b).  *Id.*  Finally, Trustee argues that

the Court should disallow the amounts claimed by DLP for prepetition

interest for all of the loans.  *Id.* at 3.

## 1.      Recharacterization of the Factoring Loan

Section 726(a) provides the order of distribution of property of the

estate in a chapter 7 case.  In sum, it provides that a debtor (or, as here, the

equity owners thereof) can receive nothing from the estate until after all

administrative expenses and claims held by creditors are paid in full with

interest.  § 726(a)(1)–(6); *see also* § 101(10)(A) (defining "creditor" as an

"entity that has a claim against the debtor" arising before the bankruptcy

filing); § 101(5)(A) (defining "claim" as "right to payment").  This

distribution scheme, under which chapter 7 creditors are paid before those

who hold equity in a debtor-corporation, is what makes characterization of

a "claim" as debt or equity critical in a case like this, where there will not

MEMORANDUM OF DECISION – 12

be enough funds available to satisfy all allowed creditor claims in full.  In

other words, if the Factoring Loan is allowed as an unsecured claim, it will

share ratably in any distributions with other creditors.  If, instead, the

Factoring Loan is recharacterized as equity, DLP will receive no

distribution.

While DLP asserts it is a creditor holding an allowable claim against

DVT in this case, the Code gives bankruptcy courts authority, under

appropriate circumstances, to "recharacterize" claims as equity in

bankruptcy cases.  *Official Comm. of Unsecured Creditors v. Hancock Park*

*Capital II, L.P. (In re Fitness Holdings Int'l, Inc.)*, 714 F.3d 1141, 1148 (9th Cir.

2013).  In the Ninth Circuit, "to determine whether a particular obligation

owed by the debtor is a 'claim' for purposes of bankruptcy," courts must

decide whether the holder of the obligation has "a 'right to payment'

under state law."  *Id*.  If it does not, "the court may recharacterize the

debtor's obligation to the transferee under state law principles."  *Id.* at

1147.  To the extent state law would not recognize a claim as a debt, but

rather, would treat it as an equity interest, the claim is disallowed and

MEMORANDUM OF DECISION – 13

recharacterized as an equity interest.  *See In re Lothian Oil Inc.*, 650 F.3d 539, 544 (5th Cir. 2011), cited with approval by the Ninth Circuit in *In re Fitness Holdings*, 714 F.3d at 1148.

So how should the DLP Factoring Loan be treated?  In Idaho, courts may recharacterize debts as capital contributions based on the intent of the parties, regardless of the labels the parties may assign to their transactions. *Idaho Dev., LLC v. Teton View Golf Estates, LLC,* 272 P.3d 373, 378 (Idaho 2011).  The determination as to whether to recharacterize an advance as a capital contribution or as a loan is a question of fact.  *Id.*  Importantly, the party seeking to recharacterize an advance as equity carries the burden of proving it was a capital contribution.  *Id.* at 380.

In *Idaho Dev., LLC*, the Idaho Supreme Court explains that, in this context:

> The real aim of the trial court is to make the determination whether an advance is debt or equity, which depends on the distinction between a creditor who seeks a definite obligation that is payable in any event, and a shareholder who seeks to make an investment and to share in the profits and risks of loss in the venture . . . .

MEMORANDUM OF DECISION – 14

*Id.* at 377.  As an example, the Idaho Supreme Court pointed to a prior decision where it found shareholders were not creditors because:

> (1) they were not listed on the corporate records as creditors;
> (2) no note was executed;
> (3) the proceeds of the loans were not used for corporate purposes; and
> (4) a different creditor had relied on the availability of the funds to satisfy its loan, but they were ultimately not available.

*Id.* at 378 (citing *Weyerhaueser Co. v. Clark's Material Supply Co.*, 413 P.2d 180 (Idaho 1966)).  In addition to the *Weyerhauser* factors, the Idaho Supreme Court has also considered the level of capitalization of the entity receiving the advance, the language of the documents, and whether there were fixed repayment terms.  *Id.* at 380 (referencing factors used *In re SubMicron Systems, Corp.*, 291 B.R. 314 (D. Del. 2003)).

Employing these factors here, the Court finds and concludes that DVT and DLP intended the Factoring Loan to be just that, a loan.  Both Jason and Janet testified that when Jason originally approached the Duncans about "investing" in DVT, they both declined.  It was not until Jason offered the Duncans the terms of the Factoring Loan that they were

MEMORANDUM OF DECISION – 15

persuaded and decided to provide funds to DVT.  And the money

advanced by DLP to DVT was used in its corporate operations.

> While the Factoring Loan was originally an oral agreement, a

promissory note was ultimately executed by DVT to evidence and modify

the terms of the oral agreement which describes, in no uncertain terms, a

credit transaction.  This note labels DLP as a lender, requires DVT to repay

the factoring advances at a fixed rate of interest in monthly payments, has

a fixed maturity date, and specifies events of default entitling DLP to

accelerate the balance due on the loan.  Ex. 206.  And that DLP entered the

subordination agreement with GE Capital further evidences that DVT and

DLP intended the Factoring Loan to be a debt.  Indeed, if the parties

considered the advances made by DLP to DVT to be an equity interest,

that interest was, by definition, already subordinate to GE Capital's loan,

and no subordination agreement would have been required, or at least,

DLP's equity interest would have been described as such in that

agreement.

> Trustee argues that if the Court focuses upon the original terms of

MEMORANDUM OF DECISION – 16

the parties' oral agreement, especially the 25% interest rate and the lack of a fixed maturity date, the Court should come to a different conclusion about the nature of the transaction.  Tr.'s Br. at 8.

As the "determinative inquiry" is the intent of the parties "as it existed at the time of the transaction," the Court is now hesitant to look behind the terms of a signed promissory note. *Idaho Dev.*, 272 P.2d at 377. But in addition to what the parties may say in their contracts, their intent may be inferred "from what they do through their actions, and from the economic reality of the surrounding circumstances." *Id.* at 377-78. Regardless, even considering the terms of the parties' original oral agreement, Trustee has not persuaded the Court that the transaction should be recharacterized.  While the original 25% interest rate seems high, Paul testified that DVT proposed that rate because it was already paying another factoring company an even higher rate.  Trustee provided no evidence to the contrary.  Thus, to the Court, the original interest rate is not a dispositive indication of a capital contribution.

The lack of a maturity date under the oral agreement also fails to

MEMORANDUM OF DECISION – 17

sway the Court's opinion.  The fixed monthly payments of only accrued

interest support the purpose of the loan to provide continuing "gap"

financing for the time between DVT paying its drivers and receiving

payment from its customers.  Additionally, the Court infers from Jason's

testimony that the lack of a maturity date was more due to the parties

simply neglecting to establish one at the time the agreement was made, not

because the parties intended that DVT would not be obligated, at some

future time, to repay all of the funds advanced.

Considering all of the evidence, the Court finds the Factoring Loan

was a debt, and declines Trustee's request to recharacterize the transaction

as a capital contribution and to disallow DLP's claim in the bankruptcy

case on this basis.

### 2.    Subordination of the Factoring Loan under § 510(b)

Trustee argues that, even if the claim for the Factoring Loan became

a "debt" when DVT executed the promissory note, and therefore is a

"claim" for purposes of § 502, the Court should find that DLP's claim

based upon the Factoring Loan should be subordinated to other allowed

MEMORANDUM OF DECISION – 18

unsecured claims pursuant to § 510(b).  Tr. Br. at 6.  Section 510(b)

provides that:

> "[A] claim arising from recision of a purchase or sale of a
> security of the debtor . . . , for damages arising from the
> purchase or sale of such a security, or for reimbursement or
> contribution allowed under section 502 on account of such a
> claim, shall be subordinated . . . ."

The definition of a "security" within the Code includes a non-exhaustive

list of a number of instruments.  *See* § 101(49)(A).  However, to support his

argument, Trustee focuses solely on one type of instrument: an

"investment contract." § 101(49)(A)(xii); Tr. Br. at 6.  He argues that under

the test established in Idaho case law,[7] the original oral agreement for the

Factoring Loan between DVT and JD Farm's was an investment contract.

*Id.*  And because the promissory note arose from the parties' oral

agreement, DVT's claim "arose out of the purchase of a security" for

purposes of § 510(b).  *Id.; see also Pensco Tr. Comp. v. Tristar Esperanza*

---

[7]  Both parties seem to agree and rely only upon state law to support their
arguments concerning the meaning of "investment contract" in this context.
Under these circumstances, and given the Court's decision on this issue, the
Court need not decide whether the parties' suggested approach is the correct
one.

MEMORANDUM OF DECISION – 19

*Props., LLC (Tristar Esperanza Prop., LLC)*, 782 F.3d 492, 496–47 (9th Cir. 2015).

### a.    *Recharacterization vs. Subordination*

DLP argues that determining whether the original agreement was an investment contract, in order to come within the broad reach of § 510(b), is a misapplication of the concept of claim recharacterization as adopted by the Ninth Circuit in *In re Fitness Holdings*.  DLP's Br. at 5–6. DLP insists that the Court may only recharacterize transactions in connection with the § 502 claims allowance process.

DLP is correct that § 510(b) applies to determine the relative priority of distribution to those holding otherwise allowed claims, rather than deciding whether a party holds a claim at all.  *See* § 510(b).  As the Ninth Circuit has emphasized, for purposes of § 510(b), the critical question, "is not whether the claim is debt or equity at the time of the petition, but rather whether the claim arises from the purchase or sale of a security." *Tristar Esperanza*, 782 F.3d at 497.

However, even if DLP holds an allowed claim, it must be

MEMORANDUM OF DECISION – 20

subordinated to other claims "if there is a sufficient nexus or causal

relationship between the claim and the purchase or sale of securities." *Id.*

As the Ninth Circuit explains:

> Even though the claims were based on promissory
> notes—fixed, admitted debts at the time of the petition—we
> remanded for determination of the origin of the notes,
> instructing the lower court that [i]f the promissory note claims
> are linked to the [issuance of securities], they should be
> subordinated."

*Id.* (citing *In re Betacom of Phx, Inc.*, 240 F.3d 823, 832 (2014)).

Thus, here, the Court must look beyond the unambiguous language

of the DLP promissory note for the Factoring Loan, to the nature and

subject of the parties' oral agreement, with the goal of determining

whether the parties' original oral Factoring Loan agreement was an

investment contract for purposes of subordination under § 510(b).

**b.** *"Investment Contract"*

Trustee relies on the *Howey–Forman* test,[8] as adopted by the Idaho

---

[8] *See S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946); *United Hous. Found., Inc. v. Forman*, 421 U.S. 837 (1975).

MEMORANDUM OF DECISION – 21

Supreme Court, to argue the oral agreement constituted an investment contract. *State v. Gertsch*, 49 P.3d 392 (Idaho 2002); *see also, In re Gables Mgmt., LLC*, 473 B.R. 352, 360 (Bankr. D. Idaho 2012) (citing *Gertsch*, 49 P.3d at 396). This Court, in *Gables*,[9] observed that:

> The [*Howey-Forman*] test has three prongs to show the existence of an investment contract: 1) an investment of money, 2) a common enterprise, and 3) a reasonable expectation of profits to be derived from the entrepreneurial or management efforts of others.

*Id.* at 360 (citing *Gertsch*, 49 P.3d at 396).

When measured against these factors, the parties oral agreement for the Factoring Loan fails the third-prong of the *Howey-Forman* test. Under the third prong, the Duncans must reasonably have expected to make a "profit", which is "generally defined as either 'capital appreciation resulting from the development of the initial investment . . . or a participation in earnings resulting from the use of investors' funds." *Id.*

---

[9] Ironically, the Court in *Gables* analyzed the Idaho Supreme Court version of the *Howey-Forman* test in a claims allowance context. *Gables*, 473 B.R. at 354. However, despite this being a § 510(b) analysis, the determination of whether a transaction is an investment contract remains the same.

MEMORANDUM OF DECISION – 22

(citing *Forman*, 421 U.S. at 852).  Here, JD Farms' returns on the Factoring

Loan were not tied to the value of its assets, nor did DLP anticipate in

sharing in the earnings generated by DVT beyond that necessary to repay

the loan plus interest.  Instead, DLP expected only to recover the funds

advanced (*i.e.*, "loaned") to DVT, with fixed amounts of interest,

regardless of the financial success or failure of DVT.  Thus, the oral

agreement was not an investment contract.

Trustee argues that the fixed interest payments should not be

dispositive since transactions resembling loans have been held in other

cases to be investment contracts when they carry extremely high interest

rates.  Tr.'s Br. at 9; *Gables*, 473 B.R at 361.  However, the "extremely high"

rate referenced in *Gables* was the "equivalent of one hundred percent

annually in some cases."  *Id.*  (citing *Gertsch*, 49 P.3d at 392).  Indeed, the

Court has held that a rate that is merely "above market" does not qualify

as "extreme."  *Id.*  As was discussed earlier, in context, the twenty-five

percent interest rate originally provided for in the oral agreement for the

Factoring Loan was high, but not "above market," and thus, by no means

MEMORANDUM OF DECISION – 23

"extreme."

Trustee also points to the lack of a fixed maturity date in the parties'
oral agreement as evidencing DLP's intent to invest in DVT.  But as
explained previously, this argument is not persuasive to the Court under
the circumstances here.  DVT was a fairly new venture, the Duncans were
family, and the failure of the parties to set a firm date for repayment of the
principal amounts advanced under the Factoring Loan does not change
the character of the transaction.

Under the *Howey-Forman* test, the original agreement between DVT
and DLP was a loan, not an investment contract, and thus not a security.
Because of this, the promissory note, and DLP's claim for the Factoring
Loan, did not arise from DLP's purchase of a security and cannot be
subordinated pursuant to § 510(b).[10]

### C.    The Allowance of Pre-petition Interest

A claim is to be allowed, except to the extent it is unenforceable

---

[10] The Court need not consider DLP's other arguments against the
applicability of § 510(b).  *See* DLP's Br. at 10–11, Dkt. No. 457.

MEMORANDUM OF DECISION – 24

against the debtor under any agreement. § 502(b)(1). Trustee argues that the Court should disallow DLP's claim for any prepetition interest on the loans because, as of the petition date, DLP had no enforceable right to recover such interest. Tr.'s Br. at 5, Dkt. No. 456. He contends that, under the terms of the various promissory notes, no payments were due on the DVT loans before the bankruptcy petition was filed, and thus, no interest could have accrued on the loans. *Id.* In his view, no interest would accrue on the loaned funds until repayment was due. *Id.*

The Court declines to credit Trustee's argument because the language of the promissory notes contradicts it. Indeed, section four of each of the promissory notes, entitled "Interest," explicitly provides that interest was to accrue on the loan balances beginning on the effective date of the notes, regardless when payments were to commence. *See, e.g.*, Ex. 214 at 1. In contrast, the payment provisions relied upon by Trustee in no way restrict or delay the accrual of interest. They simply provide that monthly payments to DLP need not be made by DVT unless certain "payment conditions" were met, or, at the latest, on October 15, 2015. Ex.

MEMORANDUM OF DECISION – 25

214 at 1–2.

While Trustee argues that the amortization schedules attached to the promissory notes support his position, the Court finds the opposite is true. Indeed, the first payments on each amortization schedule include a large interest component.  *See, e.g.* Ex. 204 at 4.  In other words, the amortization schedules presume interest accrued on the loans prior to the time the first payments were due on the loans.

Simply put, DLP is entitled to recover, as part of its claim, all interest that accrued on the three loans up to the date of DVT's bankruptcy filing.

### *Conclusion*

DLP's claims for the Factoring Loan will not be recharacterized as equity, nor will it be subordinated pursuant to § 510(b).  Additionally, prepetition accrued interest will be allowed for the claims for the Winch Truck Loan, the Equipment Loan, and the Factoring Loan.

However, there were discrepancies between the amounts asserted to be due on DLP's claim in its Amended Proof of Claim as compared to those set forth in its closing brief, but no admissible evidence was

MEMORANDUM OF DECISION – 26

submitted to establish the amount due on the three loans on the date of the

bankruptcy filing.  If the parties can agree on the amounts due, they are to

submit an agreed form of order which includes those amounts for entry by

the Court.  To the extent the parties cannot agree on the amounts to be

allowed, DLP is to file a second amended proof of claim, to which Trustee

can object if he further contests the amounts due.

Dated:  March 13, 2017

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge

MEMORANDUM OF DECISION – 27